2023 IL App (1st) 221264

SIXTH DIVISION

December 22, 2023

No. 1-22-1264

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
|---|---|---|
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 CR 16864 |
| | ) | |
| CARL MOBLEY, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court, with opinion.
Presiding Justice Oden Johnson and Justice Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury trial, defendant Carl Mobley was found guilty of unlawful use of weapon by a felon (UUWF) (720 ILCS 5/24-1.1 (West 2016)) and sentenced to five years' imprisonment. He appeals, claiming that the statute is unconstitutional as applied to him. Specifically, Mobley claims

the statute improperly infringes on his right to keep and bear arms by barring him from possessing a firearm because he has a nonviolent felony conviction. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     The State charged Mobley by indictment with six counts, including count I for UUWF, pursuant to an incident on November 3, 2018. Count I alleged that Mobley possessed a firearm after being convicted of escape, a felony, in case No. 10-CR-10915. The State nol-prossed counts II through VI before trial and proceeded on count I alone. In a motion *in limine*, Mobley indicated he had 12 previous felony convictions, including the escape conviction.

¶ 4     A jury trial began on June 7, 2022. Lewis Sellers testified that on November 3, 2018, at approximately 1:51 a.m., he was working as an escort near the intersection of Troy Street and 47th Street in Chicago. At some point, a man approached, whom Sellers identified in court as Mobley. Sellers had never interacted with Mobley before but had seen him in the area. Mobley said "vulgar" things to Sellers, walked away, then returned carrying a firearm. He pointed the firearm at Sellers' head and told him to leave or "there would be a problem." A female "associate" of Mobley's then "intervened," and she and Mobley exited. Sellers did not know the woman personally but had witnessed her working as an escort in the same area previously.

¶ 5     Sellers called 911, and police officers arrived on scene shortly thereafter. The officers interacted with Mobley in a nearby parking lot. Sellers also spoke to the officers and identified Mobley as the man who threatened him with a firearm. The officers showed a firearm to Sellers, and he identified it as the same Mobley used to threaten him.

¶ 6     Chicago police officer Madrigal[1] testified that he and his partner responded to the incident on November 3, 2018. Madrigal wore a body camera that recorded the incident. The officers spoke

---

[1]Officer Madrigal's first name does not appear in the report of proceedings.

with Sellers on the scene, then located Mobley in a nearby strip mall parking lot. Mobley, alone in a red SUV, exited to interact with the officers. The officers eventually located a firearm in the SUV's backseat area, then arrested Mobley. Later, the officers learned the woman Mobley was with, Charlene McCaa, owned the SUV. The State entered portions of the body camera recording into evidence.

¶ 7    Chicago police sergeant Robert Franks testified that he served as an evidence technician in Mobley's case and unsuccessfully attempted to obtain fingerprint evidence from the recovered firearm.

¶ 8    Chicago police detective Elliot Flagg testified that he interviewed Mobley in connection with the incident. The interview was not recorded. During the interview, Mobley stated that he was a pimp, McCaa was his girlfriend, and they had been losing money due to Sellers working on the same corner as McCaa. Mobley denied having a firearm at any point during the incident with Sellers, but admitted McCaa owned a firearm, and Mobley knew it was in the vehicle on the night of the incident. On cross-examination, Flagg testified that McCaa claimed she owned the firearm.

¶ 9    The State entered a stipulation that Mobley had "a prior felony conviction which qualifies him to be charged in this case with the charge of unlawful use of a weapon by a felon."

¶ 10   The State rested, and Mobley called McCaa, who testified that she worked as a prostitute in November 2018. On November 3, 2018, she was with Mobley on the scene and had her SUV with her, with the firearm in the backseat. She and Sellers argued that night. During the argument, Mobley exited the SUV and walked to an area across the street. McCaa did not observe anything in Mobley's hands at this time. She then left the area with a "John," and when she returned, she saw police officers near her SUV. One officer indicated he had recovered a firearm and asked if it belonged to McCaa, who responded affirmatively.

¶ 11    The defense rested, and the State called Flagg in rebuttal. Flagg testified that he interviewed McCaa and Mobley about the incident. Mobley stated that Sellers would know what the firearm looked like because McCaa showed it to Sellers previously. McCaa, conversely, told Flagg she did not show the firearm to Sellers. The defense called McCaa in surrebuttal, who stated she did show Sellers the firearm at some point before November 3, 2018.

¶ 12    The jury found Mobley guilty of UUWF. Mobley's presentencing investigation report listed numerous felony convictions, including those listed by the defense in its motion *in limine*, along with additional convictions for robbery and two counts of aggravated battery.

¶ 13    Mobley filed a motion for a new trial, which he later supplemented. He did not claim that the UUWF statute was unconstitutional as applied to him in the motion. At a proceeding on August 11, 2022, the circuit court denied the motion for a new trial. The matter moved to sentencing, where the State emphasized that Mobley had 14 felony convictions. Defense counsel argued that his prior felony convictions for retail theft and escape were "nonviolent." The court sentenced Mobley to five years' imprisonment and denied his motion to reconsider sentence. This appeal followed.

¶ 14                                      II. JURISDICTION

¶ 15    This court has jurisdiction pursuant to Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Sept. 18, 2023) because the circuit court sentenced Mobley on August 11, 2022, and he filed his notice of appeal that same day.

¶ 16                                      III. ANALYSIS

¶ 17   Mobley's lone claim on appeal is that there is no historical tradition in America of the government barring an individual from possessing a firearm on the basis that the person has a nonviolent felony conviction and that UUWF as applied to him in this case is unconstitutional

4

under the test announced by the United States Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022).

¶ 18　We must first determine whether Mobley forfeited this claim because, as he acknowledges, he did not properly preserve the issue through a timely objection at trial and inclusion in a posttrial motion. See *People v. Galarza*, 2023 IL 127678, ¶ 45. Before resolving this issue, we briefly note that there are two types of constitutional challenges—facial and as-applied—with Mobley's claim here an as-applied challenge. See *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶¶ 11-12. A facial challenge requires the claimant to demonstrate that the statute is unconstitutional under any set of facts. To establish an as-applied challenge, the claimant only "has the burden of showing that a constitutional violation arises from the application of the statute to a specific set of facts and circumstances." *Id.*

¶ 19　Mobley argues that we may consider his claim because an as-applied constitutional challenge can be raised for the first time on appeal, so long as the record is sufficient to permit the reviewing court to fully analyze the issue. See *People v. Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13. The State responds that this rule of forfeiture avoidance only applies to as-applied constitutional challenges arising under *Miller v. Alabama*, 567 U.S. 460 (2012) (mandatory life sentences without the possibility of parole for juveniles are unconstitutional). The State further contends that even if the rule can apply beyond *Miller* generally, it does not excuse Mobley's forfeiture because the record is insufficient to consider his claim. In support of this argument, the State claims that had it known Mobley intended to raise a constitutional challenge earlier in the proceedings, it could have potentially uncovered, and introduced at trial or sentencing, information regarding any history of violence in Mobley's past. The State does not identify any such information in its briefing.

¶ 20   We find that we may consider Mobley's as-applied constitutional claim, despite his failure to properly preserve it. First, the State's contention that a reviewing court may only consider as-applied *Miller* claims raised for the first time on appeal is inaccurate; courts in Illinois have considered constitutional claims in other contexts outside of *Miller* based on this theory of forfeiture avoidance. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 58. Additionally, and most importantly, the record here is sufficient for review of Mobley's claim. The only fact at issue is what conviction the State used as the predicate for UUWF, which is apparent from both the stipulation in the record and the report of proceedings. The claim is that UUWF is unconstitutional as applied to Mobley because the State used his conviction for escape, a nonviolent felony, to bar him from future firearm possession.[2] Whatever additional convictions the State might have used as a predicate, violent or nonviolent, are not at issue, nor is Mobley's history of violent behavior aside from his convictions, if such a history exists.

¶ 21   The second amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. A brief history of the recent United States Supreme Court jurisprudence regarding the second amendment is necessary to establish the parameters of our task here.

¶ 22   In 2008, the United States Supreme Court fundamentally altered second amendment jurisprudence in *District of Columbia v. Heller*, 554 U.S. 570 (2008). There, in a Justice Scalia-penned majority opinion, the Court declared for the first time that the right to keep and bear arms is an *individual* right, not a *collective* right. *Id.* at 595. Though *Heller* did not specifically establish

---

[2]The State does not contend that escape is a violent felony, and as such, we will consider it a nonviolent felony for purposes of our review here. We note, however, that the details of the escape charge were not introduced below and are not before us here, and it does not appear so facially obvious to this court that "escape" is an inherently nonviolent offense.

a mode of analysis for courts to use in reviewing whether a firearm regulation infringed upon the new individual right, the opinion did state that the familiar framework of means-end scrutiny, which permits a reviewing court to balance interests, was of suspect value in this context because the second amendment was already "the very product of an interest balancing by the people." (Emphasis omitted.) *Id.* at 635. The *Heller* majority justified its decision not to provide a mode of analysis by stating, "there will be time enough to expound upon the historical justifications for the exceptions [(*i.e.*, felons and the mentally ill)] we have mentioned if and when those exceptions come before us," and continuing, "whatever else [the second amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* Speculating as to what these potential future challenges might be, the *Heller* Court noted, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626.

¶ 23    Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), the Court held that the fourteenth amendment incorporated the second amendment, and thus claims for infringement on the right to keep and bear arms could be raised by an individual against state governments.  The Court again declined to establish a test for evaluating second amendment claims.

¶ 24    After *Heller* and *McDonald*, it was clear that the second amendment protected an individual right to keep and bear arms, which could be vindicated against infringement from both the federal and state governments. But how were courts to decide whether a regulation infringed? The Court answered this question in *Bruen*: not through the widely applied and understood means-ends analysis process, but through a historical tradition test. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2127-

30. Justice Thomas, writing for the majority, stated the post-*Heller* consensus approach—a hybrid intermediate/strict scrutiny approach—had "one step too many." *Id.* at ___, 142 S. Ct. at 2126-27. *Bruen* set out a new test, where the analysis of a firearm regulation consists only of two considerations:

> (1) Is an individual's conduct covered by the plain text of the second amendment; and
>
> (2) If so, the conduct is presumptively protected, and "[t]he government must then justify its regulation by demonstrating that it is consistent with the [n]ation's historical tradition of firearm regulation." *Id.* at ___, 142 S. Ct. at 2129-30.

¶ 25   Under this regime, the government's goal for a particular regulation is irrelevant, as is the narrowness or broadness of the means employed in pursuit of that goal. Instead, so long as the regulated conduct is covered by the second amendment's plain text, the only consideration is if the government can demonstrate the regulation is consistent with the nation's historical tradition. *Id.* at ___, 142 S. Ct. at 2129-30. *Bruen* does not explicitly provide a relevant time period to determining historical tradition but emphasizes that the understanding at the time of ratification takes precedence, quoting *Heller*: " 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*' " (Emphasis in original.) *Id.* at ___, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35).

¶ 26   In performing the historical analysis, courts must use analogical reasoning to determine if regulations from the nation's history are "relevantly similar" to the modern regulation at issue. *Id.* at ___, 142 S. Ct. at 2132. Justice Thomas explained that "analogical reasoning under the [s]econd [a]mendment is neither a regulatory straightjacket nor a regulatory blank check," and the test "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." He summarized this point by stating, "even if a modern-day

regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (Emphases in original.) *Id.* at ___, 142 S. Ct. at 2133. The *Bruen* majority further acknowledged "that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868," but declined to resolve the dispute because, with respect to the New York public carry law at issue in *Bruen*, "the public understanding of the right to keep and bear arms in both 1791 and 1868" was the same "for all relevant purposes." *Id.* at ___, 142 S. Ct. at 2138. The majority also warned, however, that post-Civil War discussions may not provide significant insight into the historical tradition of firearm regulation. *Id.* at ___, 142 S. Ct. at 2137.

¶ 27    The same panel as in this case (with Presiding Justice Oden Johnson writing the unanimous opinion) recently addressed a nearly identical claim in *People v. Baker*, 2023 IL App (1st) 220328, ¶¶ 2, 16-17, where the defendant claimed that the UUWF was unconstitutional as applied to him. This court held Baker could not invoke *Bruen* because the test only applies to "laws that attempt[ ] to regulate the gun possession of 'law-abiding citizens,' " a category to which Baker did not belong because he had a felony conviction. (Internal quotation omitted.) *Id.* ¶ 37. This conception is consistent with the statement in *Heller* that felon bans are "presumptively lawful," which, though debatably *dicta*, suggests the Court did not believe felons maintained second amendment rights post-conviction. *Heller*, 554 U.S. at 627 n.26.

¶ 28    We maintain this position here. For the reasons stated in *Baker*, we hold that Mobley cannot appeal to the *Bruen* test to argue that the UUWF statute is unconstitutional as applied to him, and we reiterate that *Bruen* strongly suggests the test only applies when a regulation impacts a law-abiding citizen's ability to keep and bear arms. *Baker*, 2023 IL App (1st) 220328, ¶ 37; see *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2132-33 ("While we do not now provide an exhaustive survey of the

features that render regulations relevantly similar under the Second Amendment, we do [believe] that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a *law-abiding citizen's* right to armed self-defense." (Emphasis added.)).

¶ 29 That Mobley is not a "law-abiding citizen" cannot be contested, though that term is not specifically defined in *Heller* or *Bruen*. The record shows Mobley has at least 14 felony convictions, including convictions for violent crimes—robbery and aggravated battery. This record is even more serious than the one we found disqualifying in *Baker*, and it denies Mobley the ability to contest his conviction under *Bruen*.

¶ 30 In so holding, however, we wish to clarify that our determination in *Baker* does not completely foreclose any defendant from arguing that *Bruen* applies to them simply because they have a felony conviction of any nature. *Baker* stands for the proposition that *Bruen* applies "only to laws that attempt[ ] to regulate the gun possession of 'law-abiding citizens,' " which excluded "felons like defendant." *Baker*, 2023 IL App (1st) 220328, ¶ 37. Mobley's voluminous record, including convictions for violent crimes, excises him from the law-abiding citizen category, despite his protestation that he is a nonviolent offender. But we neither here, nor in *Baker*, endeavored to define comprehensively who is or is not "law-abiding." Whether a defendant who is not a violent offender can demonstrate that he or she is a law-abiding citizen, and thus not a felon like Baker or Mobley, is an issue for another case. See, *e.g.*, *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (*en banc*).

¶ 31 The scenario in *Range* is helpful on this point. There, the United States Court of Appeals for the Third Circuit ruled that 18 U.S.C. 922(g)(1) (2018) was unconstitutional as applied to Range because his underlying conviction was for a nonviolent offense of "making a false statement to obtain food stamps," and it was inconsistent with America's historical tradition to disarm

someone based on such a conviction. *Range*, 69 F.4th at 98, 106. The *Range* court found that the government's historical analogues regarding the disarming of categories of dangerous people did not apply to Range, stating the fact that "[f]ounding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today." *Id.* at 104-05. Additionally, the *Range* court found no guidance in the fact that nonviolent crimes could be punished by death at the time of ratification, contending that, "The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* at 105. The *Range* court also suggested the government had failed to demonstrate that the specific punishment of lifetime disarmament was consistent with the nation's historical tradition for those in Range's position. *Id.*

¶ 32 The *Range* court, of course, used a different mode of analysis than the one this court believes represents the proper interpretation of *Bruen*. Despite this difference, we believe that it is valuable to note the case here, and particularly its result, as an example of an individual with a conviction who nonetheless was a law-abiding citizen, and thus could successfully vindicate his or her second amendment rights even under the *Bruen* test. We emphasize, however, the importance of legislative specificity in fashioning firearm regulations post-*Bruen*. While Mobley is not a litigant that presents a problematic case, in *Bruen*'s wake, it is incumbent on legislatures to carefully draft firearm regulations like UUWF to not sweep too broadly (as a regulation that impacts law-abiding citizens might) because the courts are now seriously hindered by *Bruen*'s historical tradition test from correcting overbroad law. A means-end scrutiny test, of course, controls for this issue. Consider the current issue through that prism. The goal of UUWF—the

"end"—of protecting Illinoisans from firearm violence is undoubtedly a worthy one. However, is the "means" of barring all felons, including the most non-threatening amongst them, sufficiently narrowly tailored to further this end? Perhaps not. But that is no longer a framework courts can use when reviewing a firearm regulation.

¶ 33   Finally, we also cannot help but note the deluge of cases interpreting *Bruen*, many of which, utilizing a divergent framework than the one this court established in *Baker*, have analyzed the substance of felon bans, using the *Bruen* test, and upheld those bans, even as applied to nonviolent offenders, by analogizing to the nation's historical tradition of regulating a person's firearm possession based on that person belonging to a group the government deemed dangerous. This historical tradition is firmly rooted in racism, racial prejudice, bias, and discrimination, and this court finds it incredibly unfortunate that the *Bruen* majority believed it was appropriate to revive it. See, *e.g.*, *United States v. Rowson*, 652 F. Supp. 3d 436, 466 (S.D.N.Y. 2023) ("It goes without saying that, in our modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness—would be anathema, and clearly unconstitutional. [Citation.] But the Second Amendment's inquiry into historical analogues is not a normative one. Viewing these laws in combination, the above historical laws bespeak a 'public understanding of the [second amendment] right' in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness."); see also *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) (acknowledging that the historical record suggested that, "Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed," which encompassed historical firearm bans for Native Americans and Catholics, and which had analogical value in applying

*Bruen*'s second prong). Upholding modern regulations because they are rooted in this tradition is not a tenable form of jurisprudence, but *Bruen* has been interpreted to require it, and this unacceptable regime is likely to persist until the Supreme Court rectifies the current state of the law. We echo the sentiments of Judge Sharon Coleman of the Northern District of Illinois on this subject:

"The Court is dismayed by the government's continuous reliance on admittedly bigoted and racist laws in these cases. [Citations.] Indeed, the Court would be remiss in failing to point out that the government's characterization of [the defendant], a Black man, as an 'untrustworthy adherent to the law' would have been the same characterization the founders had about the enslaved Africans. The government essentially expands on *Bruen*'s test to argue that the denial of all constitutional rights at the founding can justify the denial of some constitutional rights today. The government should be careful in 'pick[ing] [its] friends out of history's crowd.' [Citation.]

The government demonstrates ignorance and insensitivity toward this nation's history of slavery and the peculiar institution's modern impact on Black Americans. This level of disregard becomes all the more concerning when the realities of how Section 922(g)(1) is enforced against primarily Black Americans is considered. [Citations.]

Unsurprisingly, this Court rejects the government's reliance on slavery and discrimination toward Native Americans as historical analogues to Section 922(g)(1) given the regulations impermissible premise cannot impose a 'comparably justified' burden on the right of armed self-defense. Accordingly, the Court finds that Section 922(g)(1) is not analogous to discriminatory regulations regarding slavery and Native Americans." *United*

*States v. Washington*, No. 23-cr-00274, 2023 WL 8258654, at *5-6 (N.D. Ill. Nov. 29, 2023).

See also *United States v. Mitchell*, No. 1:23-cr-00198 (ALC), 2023 WL 8006344 (S.D.N.Y., Nov. 17, 2023).[3]

¶ 34                                    IV. CONCLUSION

¶ 35    Mobley cannot raise a claim under *Bruen* because he is not a law-abiding citizen, and accordingly, we affirm his conviction for UUWF.

¶ 36    Affirmed.

---

[3]In discussing this issue, the *Mitchell* court, despite *Bruen*, declined to analogize to historical firearm bans based on membership in now-protected classes, such as racial and religious firearm bans, explaining:

> "The Court rejects the abhorrent and morally corrupt historical regulations barring individuals from possessing forearms or ammunition on the basis of race, religious affiliation, and suspected disloyalty. These laws undoubtedly would not pass constitutional muster today. Despite this, several courts have found these laws relevant in determining the constitutionality of the felon-in-possession statute." *Mitchell*, 2023 WL 8006344, at *6.

The *Mitchell* Court continued,

> "This Court does not need to uphold the constitutionality of [section] 922(g)(1) on these repulsive historical regulations. *Bruen* of course requires a robust historical analysis. But it cannot stand for the proposition that the government *** should rely on questionable ill-reasoned regulations to justify burdening an individual's constitutional right to bear arms in the present day. There is undoubtedly a plethora of irrational and unjustified regulations in English and this country's histories founded at their core on discrimination. The government may not satisfy *Bruen* by relying on these laws, particularly when better suited historical analogues are available. Setting aside the morally corrupt reasoning justifying these historical regulations, this Court fails to see how race or religious-based restrictions are at all analogous to the disarming of felons. Casting such a broad net of legislation would render *Bruen*'s analogous requirement meaningless." *Id.*

***People v. Mobley*, 2023 IL App (1st) 221264**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-16864; the Hon. Michael R. Clancy, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Jessica R. Ball, and Caitlin Chenus, Assistant State's Attorneys, of counsel), for the People. |