The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number:_____

Filing Date: April 16, 2025

**No. A-1-CA-41601**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JEREMY ROMERO a/k/a JEREMY EXAVIER ROMERO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett R. Loveless, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Van Snow, Deputy Solicitor General
Michael J. Thomas, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**WRAY, Judge.**

{1}    New Mexico's felon in possession of a firearm statute, NMSA 1978, § 30-7-16(A)(1) (2022), makes it a crime to possess a firearm if, in relevant part, less than ten years have passed since the completion of a sentence or period of probation for a prior felony conviction. Section 30-7-16(E)(3)(a). Defendant Jeremy Romero appeals his conviction for being a felon in possession of a firearm and argues that the statute cannot be enforced against him—or any other felon—consistent with the Second Amendment to the United States Constitution and the analytical framework set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Assuming that the protections of the Second Amendment apply to Defendant, we conclude that our Nation's historical traditions, together with the district court's findings that Defendant is a danger or poses a risk to public safety, support imposing a criminal penalty for Defendant's possession of a firearm. We therefore affirm the district court.

**BACKGROUND**

{2}    Two Albuquerque Police Department officers lawfully approached Defendant at a gas station at 1:30 a.m. in order to detain him. Defendant fled from the gas station on foot. When the officers apprehended him, they recovered a loaded semi-automatic 9mm handgun from his pocket. In relevant part, the State charged

Defendant with one count of possession of firearm by a felon, contrary to Section 30-7-16(A)(1), and one count of resisting, evading or obstructing an officer, contrary to NMSA 1978, Section 30-22-1(B) (1981). A jury convicted Defendant on both counts, and the district court sentenced him to a term of eleven years in prison with three years suspended.

{3} After sentencing, Defendant filed a motion to vacate the portion of his sentence imposed for violating Section 30-7-16(A)(1). *See* NMSA 1978, § 31-11-6 (1966) (allowing a prisoner who is "claiming the right to be released upon the ground that the sentence was imposed in violation of the [C]onstitution of the United States" to "move the court which imposed the sentence to vacate . . . the sentence"). Relying on the United States Supreme Court's decision in *Bruen*, Defendant argued that "[f]elons are not categorically excluded from the protections of the Constitution, and the State cannot meet its burden to show a historical tradition of disarming felons." *See Bruen*, 597 U.S. at 17, 24 (requiring that any challenged regulation of Second Amendment conduct be "consistent with this Nation's historical tradition"). In response, the State asserted that it was "not required to engage in a historical analysis to support the constitutional authority of prohibit[ing] felons from possessing firearms." The district court held a hearing on Defendant's motion but the Department of Corrections was not able to make Defendant available for the setting. Rather than rescheduling the hearing, the State and Defendant's counsel agreed that

the district court could issue a ruling on the motion without further argument or evidence. The district court then issued an order denying Defendant's motion.

{4}      In that order, the district court determined that the Constitution presumptively protects Defendant's conduct and noted the apparent absence of "historical regulations specifically banning all felons from possessing firearms." Nevertheless, the district court observed that *Bruen* "recognized that historical analogies will often be necessary to analyze modern regulations," particularly "when analyzing long persisting societal problems." The district court concluded that precedents from the United States Supreme Court and multiple other jurisdictions, as well as secondary sources, support a conclusion that "there is a rich history of disarming those deemed likely to disrupt society or pose a threat to public safety." Having outlined a legal framework, the district court proceeded to find that (1) Defendant "is a repeat offender with convictions for distribution of a controlled substance, possession of a controlled substance, and escape from a community custody release program"; (2) "[t]he combination of guns and drugs presents obvious danger and risk of violent behavior"; and (3) "[t]his criminal background demonstrates that Defendant's possession of a gun poses a risk to public safety." As a result, the district court concluded that Section 30-7-16(A)(1) is constitutional "both facially and as applied to Defendant" because "the regulation of the right to bear arms by those who pose a

threat to society is deeply rooted in the Nation's historical traditions." Defendant appeals.

**DISCUSSION**

{5}    As he did in the district court, Defendant invokes the protections of the Second Amendment to raise as-applied and facial challenges to the constitutionality of Section 30-7-16(A)(1). In an as-applied challenge, "the challenging party contests only how the statute was applied against [them] within a particular context." *State v. Gutierrez*, 2020-NMCA-045, ¶ 29, 472 P.3d 1260 (omission, alteration, internal quotation marks, and citation omitted), *rev'd on other grounds*, 2023-NMSC-002, ¶ 2, 523 P.3d 560. As a result, "the facts of the challenging party's particular case are relevant in an as-applied challenge." *Id.* A facial challenge, in contrast, raises the question of "whether there is any potential set of facts to which the statute can be constitutionally applied." *State v. Murillo*, 2015-NMCA-046, ¶ 4, 347 P.3d 284. In the present case, we focus on Defendant's as-applied challenge. *See Bd. of Trs. of State Univ. of N. Y. v. Fox*, 492 U.S. 469, 485 (1989) ("[F]or reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first."). Our review of the district court's interpretation of statutes and constitutional provisions is de novo. *See Pacheco v. Hudson*, 2018-NMSC-022, ¶ 24, 415 P.3d 505. This review begins with the Second Amendment.

4

{6}     The plain text of the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. This language "guarantee[s] the individual right to possess and carry weapons in case of confrontation," *Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008), and is "fully applicable to the States" through the Due Process Clause of the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 750, 791 (2010). As is relevant to this case, "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. After *Heller* and *McDonald*, other courts employed a "means-end" analysis to determine whether firearms regulations violated the Second Amendment. *Bruen*, 597 U.S. at 17. The government was first required to justify the regulation of the right to possess a firearm according to "the scope of the right as originally understood" and then a level of constitutional scrutiny was applied based on "how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* at 18 (internal quotation marks and citation omitted); *cf. Murillo*, 2015-NMCA-046, ¶ 13 (considering whether NMSA 1978, Section 30-7-8 (1963) violated Article VI, Section 2 of the New Mexico Constitution "through the lens of intermediate scrutiny").

{7} In *Bruen*, the United States Supreme Court "established a new historical paradigm for analyzing Second Amendment claims." *United States v. Diaz*, 116 F.4th 458, 465 (5th Cir. 2024). After rejecting the previously predominant means-ends test, 597 U.S. at 17, the *Bruen* Court articulated the new framework as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 24 (internal quotation marks and citation omitted). The historical inquiry "involve[s] reasoning by analogy" to "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation." *Id.* at 28-29. This framework, the *Bruen* Court explained, captured the *Heller* and *McDonald* Courts' focus: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. As a result, for the historical analysis, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* (internal quotation marks and citation omitted). Despite the *Bruen* Court's detailed explanation of the new framework, however, courts continued to struggle with evaluating the constitutionality of firearm regulations. *See United States v. Rahimi*, 602 U.S. 680, 708 (2024) (Sotomayor, J., concurring) (suggesting that the Court's opinion "offers a more helpful model than

6

the dissent for lower courts struggling to apply *Bruen*"); *id.* at 736 (Kavanaugh, J., concurring) ("Second Amendment jurisprudence is still in the relatively early innings. . . . Deciding constitutional cases in a still-developing area of this Court's jurisprudence can sometimes be difficult."); *id.* at 739 (Barrett, J., concurring) (explaining that history should be used to "determin[e] the scope of the pre-existing right" and acknowledging that "[c]ourts have struggled with this use of history in the wake of *Bruen*"); *id.* at 741 (Jackson, J., concurring) ("Today's effort to clear up misunderstandings is a tacit admission that lower courts are struggling." (alteration, internal quotation marks, and citation omitted)).

{8}     Attempting to address the fact that "some courts have misunderstood the methodology of our recent Second Amendment cases," in *Rahimi*, the Supreme Court explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 691-92. The *Rahimi* Court reiterated that "[w]hy and how the regulation burdens the right are central to this inquiry" and explained that in order to be sufficiently analogous to the historic regulation of firearms—and therefore "to pass constitutional muster"—the modern regulation at issue must operate consistently with the historical regulation's purpose and scope. *Id.* at 692 (internal quotation marks and citation omitted). To be constitutional, in other words, Section 30-7-16(A)(1) "must comport with the principles underlying the Second

7

Amendment, but it need not be a dead ringer or a historical twin." *See Rahimi*, 602 U.S. at 692 (internal quotation marks and citation omitted).

{9}    Despite these clarifications by the *Rahimi* Court, a federal circuit court split has developed concerning how to apply prior precedent to determine the constitutionality of the federal felon in possession of a firearm statute, 18 U.S.C. § 922(g)(1). *Compare United States v. Williams*, 113 F.4th 637, 646 (6th Cir. 2024) (concluding that *Bruen* and *Rahimi* abrogated prior circuit court precedent); *Range v. Att'y Gen. U.S.*, 124 F.4th 218, 225-26 (3d Cir. 2024) (relying on *Bruen* alone to abrogate prior precedent after the Supreme Court vacated the court's prior en banc opinion and remanded for further consideration in light of *Rahimi*), *and Diaz*, 116 F.4th at 465 (5th Cir. 2024) (explaining, after *Rahimi*, that *Bruen* abrogated prior precedent), *with Vincent v. Bondi*, 127 F.4th 1263, 1265-66 (10th Cir. 2025) (concluding that *Rahimi* did not abrogate prior circuit court precedent and noting, on remand from the Supreme Court, that "our sole task is to consider the effect of *Rahimi*"); *United States v. Hunt*, 123 F.4th 697, 702-04 (4th Cir. 2024) (concluding that neither *Rahimi* nor *Bruen* abrogated prior circuit court precedent); *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) (same), *and United States v. Hester*, No. 23-11938, 2024 WL 4100901, at *1 (11th Cir. Sept. 6, 2024) (per curiam) (nonprecedential) (same).

{10} The circuit court split and the parties' arguments on appeal implicate one unsettled issue in particular—how to determine whether the regulated conduct falls within the plain text of the Second Amendment. *See Bruen*, 597 U.S. at 24 (identifying as one inquiry whether the "plain text" of the Second Amendment "covers [an] individual's conduct").[1] Some courts conclude the analysis at that stage, before reaching the history and tradition inquiry, based on two oft-repeated statements from the *Heller* decision: (1) the "assurance" that felon-in-possession laws are "longstanding" and "presumptively lawful," *see* 554 U.S. at 626-27 n.26; and/or (2) the "limitations" on the Second Amendment right inferred from the *Heller* Court's reference to "the right of *law-abiding, responsible citizens* to use arms in

---

[1] In some instances, the *Bruen* test is clearly articulated in two parts. *See Rahimi*, 602 U.S. at 744 (Jackson, J., concurring) (noting that although *Bruen* rejected the predominant "two-step approach as having one step too many, the *Bruen* majority subbed in another two-step evaluation" (internal quotation marks and citation omitted)); *id.* at 751 (Thomas, J., dissenting) ("[W]e must resolve two questions to determine if § 922(g)(8) violates the Second Amendment."). In others, some articulation of a single historical question either predominates or controls. *See id.* at 718 n.2, 734 (Kavanaugh, J., concurring) (stating that "[t]he historical approach applies when the text is vague" and "history tends to narrow the range of possible meanings that may be ascribed to vague constitutional language"); *id.* at 711 (Gorsuch, J., concurring) (explaining that "if reasonable minds can disagree whether § 922(g)(8) is analogous to past practices originally understood to fall outside the Second Amendment's scope, we at least agree that is the only proper question a court may ask"); *see also Diaz*, 116 F.4th at 466-67 ("As in *Rahimi*, the 'two-step' view of *Bruen* is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation."); *United States v. Charles*, 633 F. Supp. 3d 874, 877 (W.D. Tex. 2022) (explaining, before *Rahimi*, that "*Bruen*'s first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm").

defense of hearth and home," *id.* at 635 (emphasis added).[2] Other courts decline to interpret *Bruen* or *Rahimi* to abrogate circuit-court precedent that relied on the *Heller* assurances and/or limitations.[3] Still other courts have interpreted *Heller*, *Bruen*, and/or *Rahimi* to mean that the Second Amendment protects all those who are considered "the people," and those courts go on to analyze either historical evidence or precedent that itself analyzes historical documents.[4] Given the relatively recent

---

[2]*See, e.g.*, *People v. Alexander*, 308 Cal. Rptr.3d 380, 385 (Ct. App. 2023) (concluding that the defendant's Second Amendment challenges to California's felon in possession of a firearm law "fail under the first step of *Bruen*'s analytical framework" because "only law-abiding citizens are included among 'the people' whose right to bear arms is protected by the Second Amendment"); *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 28 (holding that a defendant challenging Illinois' unlawful use of a weapon by a felon statute "cannot appeal to the *Bruen* test to argue that [a] statute is unconstitutional as applied" because "the test only applies when a regulation impacts a law-abiding citizen's ability to keep and bear arms").

[3]*See, e.g.*, *Hunt*, 123 F.4th at 703 (concluding that *Rahimi* and *Bruen* "can be read harmoniously" with "previous decisions rejecting as-applied challenges to Section 922(g)(1)" because those previous decisions relied on both the *Heller* assurances and *Heller*'s limitation of the right to "law-abiding, responsible citizens" (internal quotation marks and citations omitted)); *Jackson*, 110 F.4th at 1125 (concluding that "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)" because of the *Heller* Court's assurances and because *Bruen* "did not disturb those statements or cast doubt on the prohibitions"); *Bondi*, 127 F.4th at 1265 (concluding that *Rahimi* "doesn't clearly abrogate the presumptive validity of § 922(g)(1)" because circuit precedent "relied on *Heller*'s instruction that felon dispossession laws are presumptively valid" and "*Rahimi* again recognized the presumptive lawfulness of these longstanding prohibitions"; *Hester*, 2024 WL 4100901, at *1 (concluding that "*Rahimi* did not discuss section 922(g)(1) or undermine our interpretation of *Heller*" but instead "reiterated that prohibitions on the possession of firearms by felons and the mentally ill, are presumptively lawful" (internal quotation marks and citation omitted)).

[4] *See, e.g.*, *Williams*, 113 F.4th at 649-50 ("On balance, the Second Amendment's plain text presumptively protects [the defendant]'s conduct. [The

10

application of the Second Amendment to the states and the ensuing developments in the law, this Court has not yet had occasion to consider these issues, and the State and Defendant disagree about whether the plain text covers *Defendant's* right to bear arms under the circumstances.[5] We need not, however, select among these different

defendant] is a member of the people claiming 'the right' to possess a gun—to 'keep and bear arms.' Section 922(g)(1) burdens that right. The question becomes whether that burden is consistent with the principles underpinning our historical tradition of regulating firearms." (citations omitted)); *Range*, 124 F.4th at 228 (explaining that "*Heller* and its progeny lead us to conclude that [the defendant] remains among 'the people' despite his 1995 false statement conviction" and considering "whether the Government has shown that applying § 922(g)(1) to [the defendant] would be consistent with the Nation's historical tradition of firearm regulation" (internal quotation marks and citation omitted)).

[5]We note that in *Diaz* yet another view of *Bruen* and *Rahimi* emerged. The Fifth Circuit determined that the Second Amendment covered the conduct that was regulated by the statute, possession of a firearm, by comparing the text of the Second Amendment to the text of the statute. *See Diaz*, 116 F.4th at 467 ("The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1), as it does with that of § 922(g)(8)" (citing *Rahimi*, 602 U.S. at 708 (Gorsuch, J., concurring)). Similarly, in *United States v. Bullock*, a federal district court interpreted *Bruen*'s first step to require an inquiry into whether the plain text of the Second Amendment covers the conduct regulated by the challenged statute, and "not the status of the person performing the conduct." 679 F. Supp. 3d 501, 525 (S.D. Miss. 2023) (internal quotation marks and citation omitted), *rev'd and remanded on other grounds*, 123 F.4th 183 (5th Cir. 2024). In this view, if the challenged statute regulates firearm possession, the first step of *Bruen* is satisfied and the plain text of the Second Amendment covers the conduct at issue. In *Rahimi*, at least one Justice seemed to use this approach. *See* 602 U.S. at 708 (Gorsuch, J., concurring) ("In this case, no one questions that the law [the defendant] challenges addresses individual conduct covered by the text of the Second Amendment."); *cf. id.* at 751-52 (Thomas, J., dissenting) (explaining that "[i]t is undisputed that § 922(g)(8) targets conduct encompassed by the Second Amendment's plain text" but also observing "[i]t is also undisputed that the Second Amendment applies to [the defendant]" because he "is a member of the political community").

11

approaches to determine whether Defendant met the burden to show that the plain text of the Second Amendment covers the conduct—the possession of a firearm by a felon. Instead, we assume as much and consider whether enforcing Section 30-7-16(A)(1) against him is consistent with our Nation's historical tradition of firearm regulation. *See United States v. Quiroz*, 125 F.4th 713, 717 (5th Cir. 2025) (assuming "arguendo that the plain text of the Second Amendment covers [the defendant and the defendant's] conduct" in order to "turn our attention to the historical analysis"); *United States v. Gore*, 118 F.4th 808, 812 (6th Cir. 2024) ("Whether or not the Second Amendment's plain text covers stolen firearms, § 922(j)'s prohibition is constitutional because it is consistent with our nation's regulatory traditions."); *see also United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (noting that an "apparent inconsistency in *assuming* the existence of a right before sustaining a law that acts as a blanket prohibition" is "outweighed by the prudence of abstaining on a question of such far-reaching dimensions" on an uncertain record).

{11}     As we have noted, Defendant's arguments on appeal require us to apply the text-and-history framework for analyzing Second Amendment challenges initiated by *Heller* and formalized in *Bruen*. Defendant focuses on the absence of any historical "categorical ban on felons possessing firearms." With a single citation to a law review article, the State argues that "typically, if not invariably" felons are "dangerous, and can be prohibited from possessing firearms on that basis alone,

without a minutiae-like examination of one particular defendant's criminal dossier versus that of another defendant." In reply, Defendant points out that "the State has presented no historical analogues akin to the firearm restriction in this case" and relies on the historical analysis in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), *rehearing en banc granted*, *vacated*, 108 F.4th 786 (9th Cir. 2024),[6] to argue that Defendant's conviction is unconstitutional because none of the "many analogues cited by the [g]overnment [in *Duarte*] . . . were distinctly similar to a blanket ban on firearms that covers violent and nonviolent offenders alike." The record before us contains little evidence supporting the State's (or Defendant's) view of the statute or the circumstances. *See United States v. Bullock*, 679 F. Supp. 3d 501, 519-22 (S.D. Miss. 2023) (expressing concern that in Second Amendment cases after *Bruen*, "[n]one of the history is tested in an adversarial proceeding" and as a result, "[t]he appellate courts do the best with the briefs they have, but all that matters is the Supreme Court's historical review, conducted de novo as a legal rather than a factual question, with dozens of amicus briefs never before seen by another court" (internal quotation marks and citation omitted). As a result, the district court relied on facts existing in the court record and persuasive legal authority to rule that Section 30-7-

---

[6]Briefing in the present case was completed before *Rahimi* was filed and therefore before *Duarte* was vacated. Given the rapid development of this area of the law, the Court gave the parties an opportunity to address both *Rahimi* and subsequently decided cases at oral argument.

16(A)(1) is constitutional "both facially and as-applied to Defendant" because "the regulation of the right to bear arms by those who pose a threat to society is deeply rooted in the Nation's historical traditions."

{12}     We first consider the district court's legal conclusion that the Legislature's categorical restriction on firearm possession in Section 30-7-16(A)(1)—prohibiting felons as a class from firearm possession—is consistent with the purpose and scope of comparable historical analogues. The district court relied on the extensive historical analyses of firearm regulation that were conducted in *United States v. Goins*, 647 F. Supp. 3d 538 (E.D. Ky. 2022), *aff'd*, 118 F.4th 794 (6th Cir. 2024), and then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), *majority opinion abrogated by Bruen*, 597 U.S. 1. The *Goins* Court noted that during the founding era, legislatures disarmed various groups "that they determined 'to pose immediate threats to public safety and stability.'" 647 F. Supp. 3d. at 552 (quoting *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting)). A growing number of appellate courts have concluded that with regard to the categorical prohibition of firearm possession, "[a]s an original matter, the Second Amendment's touchstone is dangerousness." *Folajtar v. Att'y Gen. U.S.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting), *abrogation of majority opinion recognized by Range*, 124 F.4th at 225; *see also Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to

prohibit dangerous people from possessing guns."); *Williams*, 113 F.4th at 657 ("[O]ur nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous."); *Jackson*, 110 F.4th at 1128 ("Legislatures historically prohibited possession [of arms] by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."); *Goins*, 647 F. Supp. 3d at 554 ("Simply put, the history and tradition relevant to the Second Amendment support Congress's power to disarm those that it deems dangerous.").

{13}     These sources begin to trace a thread of the historical regulation of firearm possession but after *Rahimi*, we also consider a separate thread of historical firearm regulations considered by that Court. The modern statute addressed in *Rahimi* "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that" the subject "'represents a credible threat to the physical safety of an intimate partner.'" *Rahimi*, 602 U.S. at 684-85 (quoting § 922(g)(8)). For its historical analysis, the *Rahimi* Court examined "surety" and "going armed" laws, which directly "targeted" conduct involving "the misuse of firearms." *Id.* at 696-98. Surety laws did so by restricting, in advance of any misuse, a specific person's firearm possession after a complaint "by 'any person having reasonable cause to fear' that the accused [person] would do [them] harm or breach the peace." *Id.* (quoting Mass. Rev. Stat., ch. 134, §§ 1, 16 (1836)). On an

15

evidentiary showing that "cause existed for the charge," the magistrate would "summon the accused, who could respond to the allegations." *Id.* at 697 (citing Mass. Rev. Stat., ch. 134, §§ 3-4). The going armed laws targeted the misuse of firearms after the fact, by "provid[ing] a mechanism for punishing those who had menaced others with firearms," and like the class-based, categorical thread of firearm regulations, "traced their origin to the Statute of Northampton." *Id.* (citing Statute of Northampton, 2 Edw. 3 c. 3 (1328)); *see also Goins*, 647 F. Supp. 3d at 551-52 (noting the same historical origins for the categorical restrictions); *Kanter*, 919 F.3d at 456 n.4 (Barrett, J., dissenting) (same). Thus, rather than making categorical restrictions based on characteristics common to a particular group, the *Rahimi* Court turned to conduct-based historical restrictions and ultimately concluded that "[a]n individual found by a court to pose a credible threat to the physical safety of another,"—a finding required by § 922(g)(8)—"may be temporarily disarmed consistent with the Second Amendment." 602 U.S. at 702.

{14}     At oral argument, Defendant argued that the *Rahimi* Court's holding was "very narrow" and "does not significantly alter the analysis of the primary issues in this case." Defendant also maintained that historical categorical prohibitions on firearm possession were insufficiently analogous to Section 30-7-16(A)(1) because the historical laws did not target groups like "felons" who had committed certain crimes but instead had the justification of preventing armed rebellion or existential

16

threats to the stability of the government. *See Rahimi*, 602 U.S. at 755, 776 (Thomas, J., dissenting). This argument implicates the "how and why" analysis for historical analogues that is articulated in *Bruen*. 597 U.S. at 29. Specifically, *Bruen* directs that we consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*

{15}     The *Rahimi* Court, however, read the historical surety and going armed laws together to "confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." 602 U.S. at 698 (citing § 922(g)(8)). In dissent, Justice Thomas criticized the *Rahimi* Court for "mixing and matching historical laws—relying on one law's burden and another law's justification," and argued that such an approach "defeats the purpose of a historical inquiry altogether." *Id.* at 772 (Thomas, J., dissenting). Although we agree that this approach appears to favor the justification (the "why") over the burden (the "how"), the principle that indisputably emerged from the *Rahimi* Court's analysis is that § 922(g)(8)'s "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.* at 698.[7] This principle is consistent with the

---

[7]Reliance on the *Rahimi* principle, as it fits with the how and why that underpin Section 30-7-16(A)(1), also permits this Court to turn away from reliance on the historical categorical restrictions that we have discussed. As we have

17

burden imposed by and the justification for Section 30-7-16(A)(1), and we see no reason to apply a different principle in the present case. For these reasons, we affirm the district court's legal conclusion that "there is a rich history of disarming those deemed likely to disrupt society or pose a threat to public safety."

{16}     This conclusion leaves the question whether Defendant posed a threat to public safety such that Section 30-7-16(A)(1) can be constitutionally enforced against him. To evaluate this question precisely, we consider the circumstances in the context of the shifting constitutional presumptions and burdens. Initially, the party challenging a statute has the burden to overcome "the strong presumption of constitutionality." *See State v. Anderson*, 2021-NMCA-031, ¶ 8, 493 P.3d 434 (internal quotation marks and citation omitted). That burden aligns with Defendant's

---

observed, that regulatory tradition began with the Statute of Northampton in 14th century England and continued through the Military Act of 1662, the English Bill of Rights of 1689, Parliament's disarming of Catholics during the precolonial period, and "[s]imilarly shameful disarmament policies carried over to the colonies." *Goins*, 647 F. Supp. 3d at 551-52. Indeed, "before and after the revolutionary war, states disarmed slaves and Native Americans" and "some states even constitutionalized these ignominious practices" because states feared "that slaves and Native Americans would use guns to revolt." *Id.* at 552. These laws "represent [part of] a historic tradition of disarming groups that the legislature views as threatening the public safety," *see id.* (alteration, internal quotation marks, and citation omitted), but "[i]t should go without saying that such race-based exclusions would be unconstitutional today," *Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting). Complete reliance on a historical traditional of categorical restrictions on individuals' rights at this juncture would be unnecessary and ill-advised. *See Rahimi*, 602 U.S. at 776 (Thomas, J., dissenting) (noting that the historical categorical laws are "cautionary tales" and "warn that when majoritarian interests alone dictate who is 'dangerous,' and thus can be disarmed, disfavored groups become easy prey").

burden under *Bruen* to show that the plain text of the Second Amendment covers the conduct. *See* 597 U.S. at 17, 24. We have assumed without deciding that Defendant met that burden. As a result, the constitutional presumption and the burden to overcome that presumption shifted. At this stage, we presume Section 30-7-16(A)(1) is unconstitutional, and the burden shifts to the State to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 24; *Rahimi* 602 U.S. at 691 (same) (internal quotation marks and citation omitted); *see also United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) (noting that "[t]here may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments"). The district court determined that the State met that burden based on the evidence of Defendant's prior felony convictions for distribution of a controlled substance, possession of a controlled substance, and escape from a community custody release program. We agree, based on *Bruen* and *Rahimi*, that this evidence demonstrated that the enforcement of Section 30-7-16(A)(1) against Defendant is consistent with "the Nation's historical tradition of firearm regulation," *see Bruen*, 597 U.S. at 24, because Defendant "present[ed] a threat to others," *see Rahimi*, 602 U.S. at 698; *see also Williams*, 113 F.4th at 663 (explaining that a person convicted of "a crime that inherently poses a significant threat of danger,

19

including (but not limited to) drug trafficking and burglary" can be disarmed consistent with the Second Amendment because such an individual "will have a very difficult time, to say the least, of showing [they are] not dangerous").

{17} Defendant did not contest the bare but sufficient facts that were contained in the documents reviewed by the district court, and on appeal, the burden shifted one more time. *See Williams*, 113 F.4th at 661-62 (explaining that "a class-wide disarmament of felons . . . is constitutional as it applies to dangerous individuals" because "[h]istory shows that governments may use class-based legislation to disarm people it believes are dangerous, *so long as members of that class have an opportunity to show they aren't*" (emphasis added)); *State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (explaining that "[t]here is a presumption of correctness in the district court's rulings," and the appellant therefore bears the "burden on appeal to demonstrate any claimed error below" (alterations, internal quotation marks, and citation omitted)). Because Defendant sets forth no specific attack on the district court's factual findings, they are deemed to be conclusive as to Defendant's dangerousness. *See* Rule 12-318(A)(4) NMRA.

{18} As a result, we uphold Section 30-7-16(A)(1), because as applied to Defendant, the statute, which imposes a limited restriction on firearm possession for ten years after a felony conviction, comports with the principles underlying the Second Amendment. *See Rahimi*, 602 U.S. at 692; *see also* § 30-7-16(E)(3) (defining

20

"felon" for the purposes of the criminal sanction). Because Section 30-7-16(A)(1) can be constitutionally applied under the present set of facts, Defendant's facial challenge naturally fails. *See Murillo*, 2015-NMCA-046, ¶ 4. This holding creates no bright-line rule regarding the evidence that is sufficient to establish that a particular defendant is dangerous. Rather, to constitutionally apply Section 30-7-16(A)(1), the State must demonstrate that the defendant "present[s] a threat to others," *Rahimi*, 602 U.S. at 698, subject to any challenge by the defendant to the State's showing.

**CONCLUSION**

{19} We affirm the district court.

{20} **IT IS SO ORDERED.**


_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**


_____
**J. MILES HANISEE, Judge**


_____
**GERALD E. BACA, Judge**


21