2026 IL App (2d) 240676-U
No. 2-24-0676
Order filed June 11, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

LORENZO J. GARCIA, Defendant-Appellant

Appeal from the Circuit Court of Kane County.
Honorable Alice C. Tracy, Judge, Presiding.
No. 23-CF-626

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1      *Held*:   (1) The State proved beyond a reasonable doubt that defendant constructively possessed a firearm and ammunition; (2) the trial court did not abuse its discretion in sentencing defendant; and (3) the armed habitual criminal and unlawful possession of a weapon by a felon statutes do not violate the Second Amendment on their face or as applied to defendant.

¶ 2      After a jury trial, defendant, Lorenzo J. Garcia, was found guilty of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2022)) (Count I), unlawful use of a machine gun (*id.* § 24-1(a)(7)(i)) (Count II), unlawful use of a weapon by a felon (UPWF) (*id.* § 24-1.1(a)) (Count III), unlawful possession of firearm ammunition by a felon (UPWF) (*id.*) (Count IV), aggravated unlawful use of a weapon for not having a valid Firearm Concealed Carry License (CCL) (*id.* § 24-1.6(a)(1)(3)(A-5)) (Count V), aggravated unlawful possession of a firearm without a Firearm

Owners Identification Card (FOID) (*id.* § 24-1.6(a)(1)(3)(C)) (Count VI), and possession of a firearm while being FOID ineligible (430 ILCS 65/2(a)(1) (West 2022)) (Count VII). Defendant was sentenced to concurrent terms of imprisonment. Defendant now appeals, contending that (1) the State failed to prove he possessed the firearm and ammunition; (2) he was denied his right to a fair sentencing hearing; (3) his convictions for AHC and UPWF violate the Second Amendment on their face and as applied to him. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4                                 A. Traffic Stop

¶ 5     On March 23, 2023, Illinois State Police Trooper Eric Manheim pulled over a pickup truck in which defendant was a passenger. Manheim testified at trial that the truck had an improper mirror, a rear bumper held up by a cord or rope, and the truck was repeatedly driving too close to other vehicles. Manheim activated his emergency lights and the driver of the truck pulled over to the side of the road on I-90.

¶ 6     Defendant was in the front passenger seat of the vehicle, and his fiancé, Martha Maurry, was driving. Maurry's mother, Gay Littleton, and Maurry's five-year old son were in the backseat. Manheim testified that he approached the vehicle from the passenger side because of the danger of traffic on the freeway. When he approached defendant's open window, defendant allegedly blew cigarette smoke into the officer's face. Manheim testified that this caused him concern that defendant may have been trying to mask other smells coming from the vehicle.

¶ 7     Manheim informed Maurry of the reasons for the traffic stop. As he was speaking to her through the open passenger's window, Manheim noticed that all passengers, including the minor, were unrestrained. He further observed cannabis shake, cannabis roaches, and other cannabis paraphernalia inside the front passenger's door pocket. Manheim requested identification from

the adults in the vehicle. Maurry and Littleton provided state-issued identification, but defendant was unable to provide such identification and gave the officer his name and birthdate on a piece of paper.

¶ 8 Manheim returned to his squad car and ran the various identifications through the Illinois State Police (ISP) database. He learned that the owner of the vehicle, Laqauin West, had an outstanding warrant and an unserved order of protection. Manheim contacted Master Sergeant Greg Melzer, who was patrolling nearby, and asked for backup to conduct a search of the truck. Melzer arrived after a few minutes. As he arrived, Melzer apparently moved his lunchbox from the back seat to the front. He spoke with Manheim briefly and both then officers reapproached the truck. Manheim informed everyone in the truck that he would be conducting a search of the vehicle because of the visible cannabis and related paraphernalia. He asked that everyone exit the vehicle safely from the passenger side.

¶ 9 Both officers testified that defendant became visibly nervous and turned towards the center of the truck. He did not respond to commands. Melzer opined that defendant was using his hand to cover something near the edge of his seat and the center console. Melzer opened the passenger door and placed his hand on defendant's shoulder. This prompted defendant to exit the truck without any further issues. Melzer searched defendant, placed him in handcuffs, and put him in the back of his squad car.

¶ 10 Manheim instructed the other occupants to safely exit the truck and they followed his instructions. A search revealed that Littleton had an open mason jar of alcohol and cannabis in a bag in her purse. No additional contraband was found on either Maurry or the minor.

¶ 11 After searching the individuals, Manheim turned his attention to a search of the vehicle. Manheim quickly discovered a handgun tucked between the passenger's seat and the center

console. Manheim testified that the handgun was a black Glock pistol with an "auto sear" installed that could turn it into a fully automatic firearm. He also found three loaded firearm magazines in the unlocked glove box. Defendant was arrested and charged with multiple possession-based firearm offenses.

¶ 12                                    B. Pretrial

¶ 13    On April 27, 2023, the grand jury returned a seven-count indictment against defendant. The case was re-presented to the grand jury on May 26, 2023, to correct a confusing answer by Manheim in response to a compound question by the State. The charges remained as follows: AHC (Count I), unlawful use of a machine gun (Count II), UPWF (Count III), UPWF ammunition (Count IV), aggravated unlawful use of a weapon for not having a valid CCL (Count V), aggravated unlawful possession of a firearm without a FOID card (Count VI), and possession of a firearm while being FOID ineligible (Count VII).

¶ 14    Defendant demanded a speedy trial and moved to represent himself *pro se*. The trial court conducted a hearing on defendant's ability to represent himself and granted the motion, discharging the public defender. Assistant Public Defender, now Associate Judge, Eun K. Yoon, was reappointed on May 18, 2023, after defendant's actions continually disrupted proceedings. Defendant moved again for Yoon's dismissal on May 24, 2023. After Yoon attested that she did not believe that there were any fitness issues and that defendant appeared to understand that he could not continue to disrupt court proceedings, the trial court granted defendant's motion.

¶ 15    Defendant filed a motion to substitute the trial court judge for cause on June 7, 2023, citing a bias against defendant. Defendant also filed a motion to dismiss on the same date, citing due process violations. The motion to substitute the trial court judge was denied on June 9, 2023. At

- 4 -

a hearing that day, defendant stated that his motion to dismiss did not need to be heard at that hearing, but he made an oral motion to suppress evidence and quash arrest.

¶ 16 The hearing on the motion to suppress evidence began on June 14, 2023. Defendant called multiple witnesses across four days, including Maurry, Manheim, Melzer, and defendant's adult son as an experienced user of cannabis to comment on items recovered from the vehicle. At the close of defendant's case, the State made a motion for a directed finding that the officers had probable cause to search the vehicle. On June 30, 2023, the trial court granted the State's motion, finding the two officers credible and Maurry not credible. After finding that defendant had failed to make a *prima facia* case that the officers lacked probable cause to search the vehicle, the trial court denied the motion to quash and suppress the evidence.

¶ 17 Defendant continued to make a wide range of pretrial motions during the ensuing weeks. Such motions included but were not limited to: "motion to dismiss for evidence destruction," "motion to dismiss for due process violation," "motion for sanctions for failure to comply with discovery," "motion to dismiss for prosecutorial misconduct," and a motion for the trial court to recuse itself. Each motion was timely addressed and ruled upon. [1] Defendant refused to make any stipulations, including a refusal to stipulate to his two prior felony convictions. The trial court explained clearly, and repeatedly, that such a stipulation would have prevented the jury from hearing that one of the convictions was for aggravated unlawful use of a weapon, but defendant refused to stipulate. Defendant also refused to consider a possible plea deal unless it resulted in a dismissal of all charges.

---

[1]We also note that defendant repeatedly threatened the trial court with complaints to the Judicial Inquiry Board and threatened both his own public defender and prosecutors with complaints to the Attorney Registration & Disciplinary Commission.

¶ 18                                         C. Trial

¶ 19    The jury trial began on July 17, 2023.  The State first called John Strode, a supervisor for the FOID and CCL application processing unit at the ISP Firearm Services Bureau.  Strode testified to the rules and regulations in Illinois for obtaining a FOID card or CCL.  Having reviewed records of FOID and CCL applications, Strode testified that defendant did not have either a FOID card or a CCL at the time of the traffic stop.  Certified records verifying that defendant did not have either a FOID card or CCL were admitted into evidence.

¶ 20    Manheim testified next.  His direct testimony largely mirrored his testimony during the hearing on defendant's motion to suppress evidence.  The State sought to submit an edited version of the video captured from Manheim's patrol car, but defendant objected to the removal of sound from portions of the video.  The State explained that those portions would include hearsay, but defendant insisted the unedited video be played for the jury.  The video was entered into evidence and shown to the jury.

¶ 21    On cross examination, Manheim agreed that he did not smell cannabis in the truck.  Defendant asked why Manheim did not find the handgun when he first looked into the vehicle, and Manheim explained that he was initially focused on instructing the other passengers on safely exiting the truck before he began his search.  Manheim testified that the gun was visible from a certain angle when he entered the vehicle.  Defendant asked Manheim if he had planted the firearm in the vehicle, and Manheim denied the accusation.

¶ 22    Melzer testified that he was on patrol at the time of the traffic stop and responded to Manheim's request for assistance.  Melzer's direct testimony was substantially similar to his testimony in the hearing on defendant's motion to suppress evidence.  Melzer opined that

defendant's actions suggested that he was trying to conceal something near the center console of the truck.

¶ 23    On cross examination, Melzer remembered that Manheim contacted him for assistance but could not remember if Manheim had called him on his personal cell phone. Melzer agreed that he smelled cannabis coming from the vehicle.

¶ 24    The State next called Kurt Murray, a forensic scientist employed by the ISP, to testify. Murray testified that he specialized in firearms and tool mark identification. His examination led him to conclude that the gun recovered from the truck was a functioning firearm. The auto sear switch converted the Glock handgun from a semiautomatic weapon to a fully automatic weapon. On cross examination, Murray acknowledged that his examination of the functioning of the firearm did not provide any evidence as to whether defendant ever possessed it.

¶ 25    The State's final witness at trial was Michelle Borrero, a forensic scientist with the ISP who specialized in latent fingerprint analysis. Borrero testified that she was able to recover a latent fingerprint from the firearm after completing four steps of processing. The latent print was located on the top rear of the firearm. Borrero testified that she compared the fingerprint to defendant's fingerprint card and opined that it was a match for the little finger on his left hand. She had also recovered hair fibers from the gun that she preserved for DNA testing but testified that it was laboratory policy to not undertake additional testing if an identification could be made from a latent fingerprint.

¶ 26    On cross examination, Borrero clarified that some portions of the latent fingerprint were distorted, but there was enough for her to make her comparison. She did not directly exclude the fingerprints of Manheim and Melzer in her analysis, but Borrero testified that this was unnecessary since she had identified it as belonging to defendant.

¶ 27    The State sought to admit into evidence certified copies of defendant's felony convictions for aggravated unlawful use of a weapon and residential burglary. The trial court allowed the documents into evidence over defendant's objections and the State rested. Defendant chose not to move for a directed finding. The trial court then stated that, if defendant had made the motion, she would have denied it at that point.

¶ 28    Defendant called his fiancé, Maurry, as his sole witness. Defendant chose not to testify on his own behalf. Maurry testified she had borrowed the truck from her cousin, Laqauin West, on the day of the traffic stop. West lent his truck to many others, according to Maurry. She did not search the vehicle when she borrowed it and had only been driving it for thirty minutes when she was pulled over by Manheim. Maurry testified that she had not seen defendant with a firearm and that she did not see a firearm by defendant's seat, despite having a clear view of the area. She did not see defendant use any cannabis or paraphernalia in the vehicle. After a brief cross examination by the State, defendant rested.

¶ 29    The trial court instructed the jury, and they began deliberations. During deliberations, the jury asked three questions in writing: (1) were there any other fingerprints on the gun, (2) were there any fingerprints found on the extra magazines, and (3) "would the intent to control a thing be different than an intent to use a thing?" For the first two questions, the trial court responded that the jury "have heard all of the evidence. You must rely on the evidence presented." For the third question, the trial court responded that the jury must "Please rely on the law contained in the jury instructions which were previously submitted."

¶ 30    Later that afternoon, the jury found defendant guilty of all seven counts. All verdict forms were signed by the jury foreperson and the other 11 jurors. Neither the State nor defendant requested that the jury be polled.

¶ 31                                    D. Posttrial

¶ 32     The trial court held a hearing on posttrial motions on September 15, 2023. Defendant moved for an acquittal of the convictions, arguing that the jury was not unanimous in their decision. The State countered that each of the verdict forms was signed by all 12 members of the jury. Defendant argued that the records had been doctored. The trial court showed defendant digital copies of each of the signed verdict forms and denied defendant's motion.

¶ 33     Following the ruling on posttrial motions, the trial court gave defendant another opportunity to cooperate with Adult Court Services in its effort to prepare a presentence investigation. The trial court explained that the presentence investigation report was a key tool for understanding defendant's background as it fashioned a sentence. Defendant declined. The trial court then proceeded with sentencing.

¶ 34     The trial court informed defendant of the following range of penalties: (1) for AHC, a minimum of 6 years and a maximum of 30 years, to be served at 85 percent with a 3-year mandatory supervised release, (2) for knowingly possessing a machine gun, a minimum of 6 years and a maximum of 30 years, to be served at 85 percent with a 3-year mandatory supervised release, (3) for UPWF, a minimum of 3 years and a maximum of 14 years, (4) for UPWF ammunition, a minimum of 3 years and a maximum of 14 years, (5) for aggravated unlawful use of a weapon for not having a valid CCL, a minimum of 6 years and a maximum of 7 years, (6) aggravated unlawful possession of a firearm without a FOID card, a minimum of 6 years and a maximum of 7 years, and (7) for possession of a firearm while being FOID ineligible, a minimum of 2 years imprisonment. None of the penalties required mandatory consecutive sentences.

¶ 35     The State called Sheriff's Deputy Joseph Sceerey to testify to evidence in aggravation. Sceery testified he was a corrections officer with the Kane County Sheriff's Department and that

defendant had received "jailhouse tickets" for a significant number of incidents of misconduct. The State presented videos from within the Kane County Jail that showed defendant battering another inmate. As the videos were being presented, defendant asked the court "You don't want to watch the video with me, Your Honor?" The trial court declined, stating that "You think I'm a hillbilly judge," a reference to defendant's statement to sheriff's deputies that the judges in the county were "hillbilly judges."

¶ 36　Following the presentation of the State's evidence in aggravation, the trial court sought evidence in mitigation from defendant. Defendant declined to provide any evidence in mitigation other than a reference to his family. Defendant noted that they had been at almost every proceeding and that he had a young child, his fiancé's son. Defendant stated that he did not think the trial court was a "hillbilly judge," but declined to provide a statement in allocution.

¶ 37　At the sentencing hearing, the State moved for Counts II, III, V, VI, and VII to be merged into Count I, the conviction for AHC. The State noted that all of those counts involved one act, the possession of a firearm. The State asked that Count IV not be merged into Count I, however, as Count IV involved the possession of ammunition by a felon. After arguing factors in aggravation, the State asked the trial court to sentence defendant to 20 years for AHC to be served at 85 percent and a consecutive sentence of 6 years for UPWF ammunition to be served at 50 percent.

¶ 38　The trial court sentenced defendant on September 26, 2023. The trial court considered all of the evidence presented at trial, the sentencing hearing, the presentence investigation, the evidence and arguments of counsel, and the "history, character, and attitude of the Defendant." The trial court noted that, because defendant had refused to cooperate with the presentence investigation, it knew nothing of defendant's past education, employment, military history,

finances, neighborhood accommodations, possible physical or mental health issues, possible issues with substance abuse, peer associations, criminal or behavioral patterns beyond what was contained in the record. The trial court gave little weight to the police reports. While the trial court acknowledged that defendant's fiancé had a minor son, the court noted that the child was an unrestrained passenger in a vehicle that contained open alcohol and loose cannabis roaches and paraphernalia. The trial court considered the fight defendant instigated in jail and his denial of his role. Looking at defendant's criminal history, the trial court observed that defendant had spent about half of his adult life incarcerated and was on probation at the time of the current offence. Finally, the trial court found that the sentence was necessary to deter others from committing the same crime.

¶ 39    The trial court found that defendant was not eligible for parole and then merged Counts II, III, V, VI, and VII into Count I. The trial court sentenced defendant to 12 years in the Illinois Department of Corrections (IDOC) for Count I, to be served at 85 percent. On Count IV, the trial court sentenced defendant to 6 years in the IDOC, concurrent with his sentence for Count I.

¶ 40    Defendant attempted to appeal prematurely, before filing a motion to reconsider the sentence. This court denied the motion to appeal. Defendant filed a motion to reconsider the sentence, and the trial court conducted the hearing on August 29, 2024. After hearing arguments from both sides, the trial court denied the motion to reconsider. This timely appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, defendant raises three issues. First, he contends that the evidence was insufficient to prove that he knowingly possessed the firearm and ammunition in the truck during the traffic stop. Second, defendant argues that the trial court erred in determining his sentence because of an improper double enhancement and a failure to consider mitigating factors. Third,

- 11 -

the AHC and UUWF statutes are unconstitutional under the Second Amendment. We address each argument below.

¶ 43 We first note that it is well settled that courts will not provide special treatment to *pro se* litigants. When a defendant elects to represent himself or herself, the defendant assumes the responsibility for conducting his or her own defense and is not entitled to favored treatment. *People v. Prince*, 2024 IL App (2d) 230027, ¶ 45. Defendant was admonished on the consequences of proceeding *pro se* and that he would be required to perform as an attorney would and the court could not provide any legal assistance to him. See *People v. Stevenson*, 2011 IL App (1st) 093413, ¶ 39. Defendant informed the court that he fully understood the court's admonitions and that he wanted to proceed *pro se*. It is well settled that a defendant may not be heard to complain of errors that he injected into his own trial. *People v. Scott*, 148 Ill. 2d 479, 531 (1992).

¶ 44                                    A. Weapon Possession

¶ 45 Defendant avers that the State failed to prove that he possessed the firearm and ammunition because he was merely a passenger in the vehicle, did not own the vehicle, and could not have knowingly possessed items that were hidden and never in his actual possession.

¶ 46                                    1. Waiver

¶ 47 The State argues that defendant waived this appellate theory by failing to present it completely at trial. The State notes that defendant argued at trial that there had been no gun or ammunition in the vehicle when it was pulled over for the traffic stop. In his closing argument at trial, for example, defendant asserted:

> "I state to you, ladies and gentlemen of the jury, this weapon was [either] not in this vehicle or it was placed there by these two troopers that you heard give testimony and

caught in their conflicting statements multiple times about things they had no reason to contradict themselves on unless they were trying to cover something."

The State contends that this argument at trial is contradictory to his assertion on appeal that he was unaware of the gun in the vehicle and must have accidentally left a fingerprint as he was buckling or unbuckling his seatbelt.

¶ 48    It is true that this court will generally not consider arguments not raised before the trial court. *People v. Caballero*, 102 Ill. 2d 23, 31 (1984).  New factual theories on appeal "deprive the formerly prevailing party of the opportunity to present evidence on that point." *People v. Hughes*, 2015 IL 117242, ¶ 38.  Defendant counters that a challenge to the sufficiency of the evidence may be made for the first time on appeal. *People v. Woods*, 214 Ill. 2d 455, 470 (2005).

¶ 49    In the immediate matter, defendant argued that the evidence was insufficient throughout the trial.  It is true that he leaned heavily into an argument that the weapon was planted in the vehicle by the officers, but he also stated repeatedly that he "never knew the gun was there."  He challenged officers on cross examination about whether the gun was visible or not to anyone inside the vehicle.  These few instances are a shaky foundation for something that appears to be a new factual theory on appeal.  The issue is forfeited.  Even if we were to assume that the issue had not been waived, however, we would not agree that the evidence was insufficient beyond a reasonable doubt.

¶ 50                              2. Sufficiency of Evidence

¶ 51    In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (Emphasis in original.)  *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This

standard applies whether the evidence is direct or circumstantial and does not allow a reviewing court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). We will not retry a defendant, and, on review, we must draw all reasonable inferences from the evidence in favor of the State. *People v. Jones*, 2023 IL 127810, ¶ 28. Ultimately, we will reverse a defendant's conviction based upon insufficient evidence only when the evidence is so unreasonable, improbable, or unsatisfactory that there is reasonable doubt as to his guilt. *Id.*; *People v. Garcia*, 2025 IL App (2d) 240449, ¶ 42.

¶ 52    Possession may be actual or constructive. *Jones*, 2023 IL 127810 470, ¶ 30. In this case, the gun and ammunition were found near defendant, not on his person, so the State had to show constructive possession of the firearm and ammunition. A defendant's proximity to contraband is a factor courts have found relevant when determining constructive possession. See *People v. Wise*, 2021 IL 125392, ¶ 29. Further, proof that a defendant had control over the premises where contraband is located gives rise to an inference of knowledge and possession of that contraband. *Garcia*, 2025 IL App (2d) 240449, ¶ 45. Because knowledge is the mental element of an offense, it is often proved by circumstantial evidence rather than direct proof. *People v. Leib*, 2022 IL 126645, ¶ 37.

¶ 53    We determine that a rational trier of fact could have found that defendant had control over the area where the firearm was located. The evidence showed that defendant was sitting in the passenger's seat of the vehicle, and the firearm was found between that seat and the center console. The ammunition was found in an unlocked glove box, immediately in front of defendant. The ammunition matched the firearm. An expert testified that defendant's fingerprint was found on the firearm.

¶ 54    Further, we determine that a rational trier of fact could find that defendant had knowledge of the firearm. Where possession has been shown, knowledge can be inferred from the surrounding facts and circumstances. *Jones*, 2023 IL 127810, ¶ 34. "Knowledge is often proven with circumstantial evidence [citation], and at least in some settings, knowledge may be established with reference to what a reasonable person would know under the circumstances [citation]." *People v. Purta*, 2023 IL App (2d) 220169, ¶ 21. When prompted by officers to exit the truck, both officers testified that defendant became visibly nervous and appeared to try to conceal the firearm. The jury could have found that defendant's actions in turning towards the firearm and attempting to momentarily conceal it evinced defendant's knowledge of the weapon.

¶ 55    Viewing the evidence in the light most favorable to the State, this evidence was sufficient for the trier of fact to find beyond a reasonable doubt that defendant had constructive possession of the firearm and the ammunition.

¶ 56                                      B. Sentencing

¶ 57    Next, defendant argues that the trial court abused its discretion in sentencing him to concurrent sentences of 12- and 6-years imprisonment for Counts I and IV, respectively. The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A trial court has broad discretion in imposing a sentence. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A sentence that falls within the statutory range should only be reversed when the court has abused that discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53

- 15 -

(1999). A trial court abuses its discretion when the penalty imposed is "greatly at variance with the spirit and purpose of the law, or is manifestly disproportionate to the crime." *People v. Watt*, 2013 IL App (2d) 120183, ¶ 49. A trial court is given wide latitude in sentencing as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *People v. McGee*, 2020 IL App (2d) 180998, ¶ 8. It is the responsibility of the trial court to balance the relevant factors to make a reasonable decision, and it is not for a reviewing court to reweigh such factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Generally, a sentence falling within the statutory range will be presumed to be proper. *People v. Campos*, 2024 IL App (2d) 230056, ¶ 53.

¶ 58 While we ordinarily review with great deference the trial court's choice of sentencing within the applicable guidelines, the question of whether the trial court relied on an improper factor in imposing the sentence is a question of law, which we review *de novo*. *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 15. Upon review, we may affirm a sentence that the trial court based upon an improper factor if we can determine that the weight placed on the factor was so insignificant that it did not lead to a greater sentence. *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 59                                    1. Double Enhancement

¶ 60 Defendant argues that the trial court erred in considering his 2010 conviction for residential burglary and his 2017 conviction for aggravated unlawful use of a weapon when fashioning a sentence. Defendant claims that these convictions were already considered as predicated offenses for AHC, and courts are prohibited from considering factors in aggravation that are inherent in the offence for which the criminal defendant is convicted. See *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). "The prohibition against double enhancements is based on the assumption that, in

- 16 -

designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *Id*. at 12.

¶ 61    The State counters that Illinois courts have long recognized that a defendant's entire criminal history may be considered at sentencing even when some of those offenses were statutorily applied to enhance the offense. After all, it can be inferred from the clear language of the AHC statute that the legislature intended to punish recidivists more severely. See 720 ILCS 5/24-1.7 (West 2022); see also *People v. Thomas*, 171 Ill. 2d 207, 228 (1996).

¶ 62    During sentencing, the trial court stated:

> "I look to your criminal history on the charges mentioned in Count [I], armed habitual criminal, the [aggravated] UUW from Will County, 2017, and the [residential burglary] from Cook County in 2010, not as a double enhancement in your sentence but to consider you criminal history in fashioning a sentence within the applicable statutory range."

When looked at in the context of the trial court's discussion of defendant's overall criminal history, these comments reflect the trial court's effort to fashion an appropriate sentence. The court's comments on defendant's prior convictions reflected defendant's rehabilitative potential and were a proper sentencing consideration. Thus, as in *Thomas*, the court " 'reconsidered' defendant's two prior convictions, as part of defendant's entire criminal history, in performing its constitutionally mandated duty to assess defendant's rehabilitative potential in order to fashion an appropriate sentence." *Thomas*, 171 Ill. 2d at 229. "This exercise of judicial discretion was entirely proper and does not constitute an enhancement." *Id*. We find no error here.

¶ 63                                    2. Abuse of Discretion

¶ 64    Alternatively, defendant argues that the 12-year prison sentence was "excessive, particularly in light of the nature of the offense, the age of his prior criminal history, his family support, and the fact that he has a young child." As noted above, a sentence falling within the statutory range will be presumed to be proper. *Campos*, 2024 IL App (2d) 230056, ¶ 53.

¶ 65    In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case. *Id*. There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 66    The trial court addressed the evidence in aggravation in great detail, including defendant's criminal history. The court noted defendant had been on probation for only five months for a drug-related felony in Indiana when he was charged in the immediate matter. The court considered defendant's starting a fight on camera within the Kane County Jail and then denying that he was the instigator. It is remarkable that defendant argues on appeal that the trial court failed to give weight to mitigating factors when he categorically refused to share such information with the trial court before sentencing. "Thus, defendant complains of a situation entirely of his own making." *People v. Allen*, 401 Ill. App. 3d 840, 854 (2010). It is clear from the record that the trial court considered the meager evidence in mitigation available to it.

¶ 67    Defendant also argues that the trial court allowed her personal feelings to influence her sentencing decision because she referenced defendant's statement to sheriff's deputies regarding

"hillbilly judges." A trial court must conduct itself in a fair and impartial manner, and the court may not show bias or prejudice against either party. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 115. "Judicial restraint in the court's conduct and remarks is not limited to the presence of the jury but is required throughout all the court's dealings with the litigants who come before it." *People v. Fisher*, 2023 IL App (4th) 220717, ¶ 30. "A sentencing hearing is fundamentally unfair— and due process is denied—when the proceeding is affected by judicial bias." *People v. Rademacher*, 2016 IL App (3d) 130881, ¶ 47. This is so regardless of whether the ultimate sentence imposed was within the statutory limits. *Id.*

¶ 68 A trial judge is presumed to be impartial, and it is the burden of the party challenging the court's impartiality to overcome that presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. To show bias, a defendant must demonstrate that the judge displayed "active personal animosity, hostility, ill will, or distrust towards the defendant." *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010). Judges must be fair and dispassionate arbitrators above all else. *People v. Phuong*, 287 Ill. App. 3d 988, 994 (1997). Thus, any showing of bias against a party constitutes reversible error. *Id.* Whether the trial judge's conduct requires reversal is reviewed *de novo*. *Romero*, 2018 IL App (1st) 143132, ¶ 96.

¶ 69 Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). Within the full context of the trial, we do not find that the single, offhanded remark from the trial court evinced a bias against defendant. Reviewing the record in its entirety shows that the trial court demonstrated Sisyphean patience with defendant. The trial court went above and beyond at each stage of the proceeding to assure that defendant understood the

ramifications of his choices, even as defendant was disruptive and repeatedly threatening complaints to the Judicial Inquiry Board.

¶ 70    The trial court fully reviewed all evidence before it, and, on the motion to reconsider, the trial court explicitly stated that it reviewed all factors, including defendant's rehabilitative potential.  As noted, it is not our province to reweigh those factors.  The trial court sentenced defendant to a 12-year term on Count I, which was near the midpoint of the State's recommendation of 20 years and substantially less than the maximum allowable sentence of 30 years.  Furthermore, the trial court had the discretion to sentence defendant to consecutive terms and chose to sentence him to concurrent terms.  We find that the trial court did not abuse its discretion in sentencing defendant.

¶ 71                              C. AHC and UPWF Constitutionality

¶ 72    Finally, defendant argues that his convictions for AHC and UPWF should be vacated because both statutes are unconstitutional on their face, and as applied to defendant, as violating the Second Amendment, as described by the Supreme Court in *Bruen*.  The State responds that the AHC and UUWF statutes are not unconstitutional under *Bruen* because the plain text of the Second Amendment does not apply to convicted felons and, even if it did, historical analysis supports a tradition that allows for statutes dispossessing felons of firearms.

¶ 73                                    1. Facial Challenge

¶ 74    Although defendant raised this issue for the first time on appeal, our supreme court has previously held that a party may raise a facial challenge to the constitutionality of a statute at any time.  *People v. Villareal*, 2023 IL 127318, ¶ 13 (citing *In re J.W.*, 204 Ill. 2d 50, 61 (2003)).  A facial challenge requires a showing that the statute is unconstitutional under any set of facts, i.e., the specific facts related to the challenging party are irrelevant.  *People v. Thompson*, 2015 IL

118151, ¶ 36. If there is any situation in which a statute could be validly applied, a facial challenge must fail. *People v. Rizzo*, 2016 IL 118599, ¶ 24. The fact that the statute could be found unconstitutional under some set of circumstances is insufficient to establish it as facially unconstitutional. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008). Moreover, statutes are presumed constitutional "and to rebut that presumption, the party challenging a statute's constitutionality has the burden of establishing a clear violation." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "If it is reasonably possible to construe the statute in a way that preserves its constitutionality, we must do so." *Id.* As a result, a "facial challenge to the constitutionality of a statute is the most difficult challenge to make successfully." *Oswald v. Hamer*, 2018 IL 122203, ¶ 40.

¶ 75                                    a. Second Amendment Review

¶ 76    The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend II. The version of the AHC statute in effect at the time of defendant's arrest contains the following:

> "(a) A person commits the offense of unlawful possession of a firearm by a repeat felony offender if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:
>
> (1) a forcible felony as defined in Section 2-8 of this Code;
>
> (2) unlawful possession of a weapon by a felon; aggravated unlawful possession of a weapon; aggravated discharge of a firearm; vehicular hijacking; aggravated vehicular hijacking; aggravated battery of a child as described in Section 12-4.3 or subdivision (b)(1) of Section 12-3.05; intimidation; aggravated intimidation; gunrunning; home invasion; or

aggravated battery with a firearm as described in Section 12-4.2 or subdivision (e)(1), (e)(2), (e)(3), or (e)(4) of Section 12-3.05; or

(3) any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher.

(b) Sentence. Unlawful possession of a firearm by a repeat felony offender is a Class X felony." 720 ILCS 5/24-1.7 (West 2022).

Residential burglary is defined as a forcible felony under Section 2-8 (720 ILCS 5/2-8 (West 2022)), and defendant was previously convicted of both that crime and UUWF. The UUWF statute that was in effect at the time of defendant's arrest provides in relevant part:

"It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction. This Section shall not apply if the person has been granted relief by the Director of the Illinois State Police under Section 10 of the Firearm Owners Identification Card Act." 720 ILCS 5/24-1.1(a) (West 2022).

For defendant's facial challenge to succeed, the AHC and UUWF must be unconstitutional under every conceivable set of circumstances. See *People v. Harris*, 2018 IL 121932, ¶ 38.

¶ 77　We begin with a review of the relevant Supreme Court decisions. In *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the Supreme Court declared for the first time that the Second Amendment right to keep and bear arms is an individual right rather than a collective right. In *Heller*, the Court struck down a series of District of Columbia laws that banned handgun possession in the home and required other types of firearms to be kept unloaded and disassembled

or bound by a trigger lock or similar device. *Id*. at 575, 635. The Court held that the laws violated the Second Amendment's protection of "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. The Court noted, however, that "the right secured by the Second Amendment is not unlimited." *Id*. at 626. The Court admonished that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id*.

¶ 78    Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742, 789-91 (2010), the Court held that the Second Amendment's "right to keep and bear arms for the purpose of self-defense" applied to the States through the Fourteenth Amendment (U.S. Const. amend. XIV). Further, it struck down laws enacted by the City of Chicago and a Chicago suburb similar to those in *Heller*. *Id*. at 750. In so holding, the Court stated: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill[ ] ***.' [Citation.] We repeat those assurances here." *Id*. at 786.

¶ 79    In 2022, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The issue in *Bruen* was whether "*ordinary, law-abiding citizens* have a *** right to carry handguns publicly for their self-defense." (Emphasis added.) *Id*. at 9. The Court held that, "consistent with *Heller* and *McDonald*, *** the Second and Fourteenth Amendments" protect such a right. *Id*. at 10. The Court held that *Heller* and *McDonald* did not support applying means-end scrutiny—a test that had developed in the lower courts after *Heller*—such as intermediate or strict scrutiny, in Second Amendment cases. Instead, the Court set forth a two-step framework a court must apply in determining whether a firearm regulation violates the Second Amendment. First, a court must address the question of whether the Second Amendment's plain text covers the individual's conduct. *Id*. at 18. Second, if the court determines the conduct is

covered, it must consider whether the government has affirmatively demonstrated that the regulation at issue is consistent with this country's historical tradition of firearm regulation. *Id*. at 26. This historical inquiry can take one of two forms: (1) a straightforward review of whether such regulations existed at the time of the nation's founding or (2) reasoning through analogy that a historical regulation is a proper analogue for a modern firearm regulation. *Id*. As to the latter, *Bruen* instructs that the analogue must be "relevantly similar" as judged by "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 29.

¶ 80    In *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court considered the analytical framework for Second Amendment claims following its decision in *Bruen*. In applying that analytical framework, the Supreme Court upheld a firearm restriction against an individual with a domestic violence restraining order. *Id*. at 699-700. The individual subject to the restraining order was found to pose " 'a credible threat to the physical safety' " of his girlfriend and child. *Id*. at 688-89. Without examining or even mentioning the term "law-abiding citizens," the Supreme Court began its analysis as follows: "As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id*. at 692. *Rahimi* makes clear that citizens are not excluded from Second Amendment protections just because they are not "responsible." See *id*. 701. The Supreme Court ultimately found the restriction constitutional but rejected the government's argument that the individual was not protected under the Second Amendment because he was not " 'responsible[,]' " holding that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. at 701-02.

¶ 81    Based on these cases, we turn to a two-step *Bruen* analysis. First, we must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. That is, does the conduct before the court involve the keeping or bearing of arms? See *id*. at 28. If the conduct does involve the keeping or bearing of arms, "the Constitution presumptively protects that conduct" and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 17.

¶ 82                                      i. Textual Inquiry

¶ 83    Our first inquiry is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. Specifically, are the AHC and UUWF's flat prohibitions of firearm possession by felons a violation of the plain text of the Second Amendment? This question has been addressed multiple times across the districts of the Illinois Appellate Court. There are a minority of dispositions holding that felons are part of "the people" to whom the Second Amendment applies. See, e.g., *People v. Travis*, 2024 IL App (3d) 230113, ¶ 33; *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 89; *People v. Mobley*, 2023 IL App (1st) 221264, ¶¶ 29-30; see also *People v. Jordan*, 2026 IL App (2d) 240341-U, ¶¶ 22-35 (McLaren, J., specially concurring)[2]. However, the vast majority of the Illinois Appellate Court have held that the protections afforded by the Second Amendment apply only to 'law-abiding citizens,' and not felons like defendant. See *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 (noting that the *Bruen* majority and concurrences repeated the phrase "law-abiding" 18 times); *People v. Martinez*, 2024 IL App (2d) 230305-U, ¶ 27 ("Defendant's challenge to the [UUWF] statute fails at the first step of the *Bruen* analysis because,

_____

[2] We may rely on the reasoning of a nonprecedential decision under Illinois Supreme Court Rule 23 (eff. June 3, 2025). *Zhao v. State Farm Fire & Casualty Co.*, 2025 IL App (2d) 240723, ¶ 30.

contrary to defendant's assertion, felons are not included in "the people" to whom the Second Amendment refers."); *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21 (determining that the *Bruen* decision does not apply to felons); *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 27 ("*Bruen* strongly suggests the test only applies when a regulation impacts a law-abiding citizen's ability to keep and bear arms"). Regardless of the approach to the textual inquiry, however, this court has—repeatedly and without exception—concluded that the Second Amendment permits Illinois to disarm felons.

¶ 84                                    ii. Historical Inquiry

¶ 85    We now ask whether the Government can strip defendant of his right to keep and bear arms. To carry this burden, the government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." (Internal quotation marks omitted.) *Bruen*, 597 U.S. at 27. Noting that "when it comes to interpreting the Constitution, not all history is created equal," the Court made clear that the relevant inquiry centers on what the Founders understood the Second Amendment to mean. *Id*. at 34. In other words, the Court clarified that, in looking to historical context, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–635.

¶ 86    While the various districts of the Illinois Appellate Court disagree as to the first *Bruen* inquiry, as noted above, all agree that the country's historical tradition of firearm regulation included prohibiting felons from possessing firearms. Since 2023, numerous cases have addressed the issue of whether the AHC or UPWF is facially constitutional. See *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 23, *pet. for leave to appeal pending*, No. 132054 (filed Sept. 2, 2025) (AHC); *People v. Boss*, 2025 IL App (1st) 221855, ¶ 33 (UPWF); *People v. Govea*, 2026 IL App (2d) 250069-U, ¶ 53 (AHC); *People v. Tapia*, 2026 IL App (2d) 240721-U, ¶ 53 (UPWF); *Travis*, 2024

IL App (3d) 230113, ¶¶ 32-33 (AHC and UPWF); *People v. Marcquette*, 2026 IL App (4th) 250083-U, ¶¶ 109-111 (AHC); *People v. Mallery*, 2024 IL App (4th) 231397-U, ¶¶ 22, 27 (UPWF); *People v. Lomax*, 2026 IL App (5th) 240889-U, ¶¶ 47-48 (AHC); *Stephens*, 2024 IL App (5th) 220828, ¶ 39 (UPWF). All have held that these sections are facially constitutional.

¶ 87    Defendant does not raise any argument that has not been previously considered and ably addressed by this court. We find no basis in the defendant's arguments in this matter to deviate from our previous decisions regarding the facial constitutionality of the AHC or UPWF statutes. Therefore, based upon our *de novo* review, and consistent with our previous decisions and the decisions of the numerous Illinois courts that have considered this issue, we find that section 24-1.7 and section 24-1.1(a) are facially constitutional under the Second Amendment of the United States Constitution.

¶ 88                                    2. As Applied Challenge

¶ 89    Lastly, defendant argues that his conviction should be reversed because the AHC and UPWF statutes are unconstitutional as applied to him. In contrast to facial challenges, an as-applied challenge requires the challenging party to show that the statute violates the constitution as it applies to his particular facts and circumstances. *People v. Hilliard*, 2023 IL 128186, ¶ 21. A defendant must typically present an as-applied constitutional challenge in the circuit court to develop the record regarding the specific facts and circumstances of his claim. *Brooks*, 2023 IL App (1st) 200435, ¶ 57. Where all the relevant facts and circumstances are already part of the record, the claim may be raised for the first time on appeal. *Id.* However, a "court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature." *Harris*, 2018 IL 121932, ¶ 39. It would not

be appropriate for this court to *sua sponte* consider whether a statute has been constitutionally applied since we are not the arbiters of the facts. See *People v. Mosley*, 2015 IL 115872, ¶ 47.

¶ 90    Defendant failed to raise this challenge before the trial court. Even if we were not to find the argument forfeited, however, defendant's as-applied challenge would fail because Illinois courts have repeatedly rejected the argument that the prohibition on firearm possession by felons under the AHC and UPWF statutes, as applied to either violent or nonviolent felons, violates the Second Amendment. See, *e.g.*, *People v. Welch*, 2025 IL App (1st) 231116, ¶ 60 (holding that the violent or nonviolent nature of prior convictions is irrelevant because felony status alone places the defendant outside the scope of the Second Amendment under *Bruen*); *Travis*, 2024 IL App (3d) 230113, ¶¶ 36-37 (rejecting the argument that nonviolent felonies warrant different second amendment treatment because the UPWF statute prohibits firearm possession by all felons, "irrespective of the violent or nonviolent nature of his convictions"); *People v. Leonard*, 2024 IL App (4th) 230413-U, ¶ 15, *pet. for leave to appeal pending*, No. 130678 (filed May 8, 2024) (rejecting the defendant's facial and as-applied challenges to the AHC statute because the "defendant's previous felony convictions make him not a law-abiding citizen and, therefore, *not* protected by the second amendment" (emphasis in original)). Indeed, our appellate district has consistently adhered to this reasoning. See *People v. Echols*, 2024 IL App (2d) 220281-U, ¶ 156 ("[w]hether defendant's qualifying convictions were 'nonviolent' is irrelevant, as the Supreme Court placed no qualifiers on the word 'felons' in either *Heller* or *McDonald*"); *People v. Gross*, 2024 IL App (2d) 230017-U, ¶ 27 ("[n]either *Heller* nor *Bruen* qualified the term 'felon' or otherwise limited it to violent felons"). Numerous unpublished orders are in accord. See, *e.g.* *Tapia*, 2026 IL App (2d) 240721-U, ¶ 55; *Jordan*, 2026 IL App (2d) 240341-U, ¶¶ 14-18; *People v. Hicks*, 2025 IL App (1st) 241783-U, ¶¶ 28-29; *People v. Smith*, 2025 IL App (1st) 231605-U,

¶¶ 35-37; *People v. Johnson*, 2025 IL App (3d) 240185-U, ¶ 12; see also *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (noting that "[f]elonies encompass a wide variety of non-violent offenses, and we see no reason to think that the [Supreme] Court meant 'dangerous individuals' when it used the word felon").

¶ 91    Defendant argues that he should not be considered a violent offender because his armed robbery and residential burglary charges are "aged" and his various firearms convictions are not inherently violent. We are not persuaded. Residential burglary is defined as a forcible felony for purposes of the AHC statute. 720 ILCS 5/2-8 (West 2022)). But whether a felony was violent or non-violent in nature is irrelevant to a Second-Amendment analysis. *People v. Rodgers*, 2025 IL App (2d) 240327-U, ¶ 47. It does not matter that violent felonies are less recent than his purported non-violent felonies. Because defendant's predicate offenses do not alter his status as a felon under *Bruen*, his as-applied challenge to the AHC and UPWF statutes necessarily fail.

¶ 92                                III. CONCLUSION

¶ 93    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 94    Affirmed.